PETER J. MULLIN, PLAINTIFF-APPELLANT, v. JOSHUA RINGLE, *ET ALS.*, DEFENDANTS-RESPONDENTS.

Argued May 5, 1958—Decided June 2, 1958.

Mr. *Arthur C. Mullen* argued the cause for plaintiff-appellant (Mr. *William P. Taylor,* attorney).

*Mr. Meyer Pesin,* Assistant Corporation Counsel of Jersey City, and *Mr. Francis X. Hayes* argued the cause for defendant-respondent John Ahearn (*Mr. Ezra L. Nolan,* Corporation Counsel of Jersey City, attorney for and of counsel with all defendants-respondents except John Ahearn).

The opinion of the court was delivered by

FRANCIS, J.   The 47 defendants involved in this appeal are employees of the City of Jersey City.   Forty-six of them bear the designation of "Park Patrolman" and one is classified as "Park Police Chief."   All of them are assigned to and work within the Department of Parks and Public Property.   Plaintiff, a taxpayer, challenges the validity of their appointment, claiming that no statutory authority exists for the establishment by a municipality of a Park Police unit. The trial court held that the city lacked power to create a Department of Park Police but that employment of the individual defendants as park patrolmen and park police chief was within its legislatively delegated competence.   Some incidental questions involved in the controversy were also disposed of by the judgment, but review is not sought with respect to them.   The appeal was certified to this court on our own motion.

Jersey City has adopted the commission form of government and now functions under the Walsh Act through a board of commissioners.   *N. J. S. A.* 40:70-1 *et seq.*   This board has all of the municipal powers formerly exercised by the mayor and council, including those previously conferred on the city by any special or general law, which is not in conflict with the Walsh Act.   *N. J. S. A.* 40:71-8; 40:72-2, 3.

By virtue of this inheritance, the board became invested with control over the playgrounds and recreation places of the city.   *N. J. S. A.* 40:184-1 *et seq.*   And it was empowered to appoint such a number of "custodians and assistants" as are deemed necessary and who, "while on duty and for the purpose of preserving order and the observance of" rules and regulations, shall *"have all of the powers and*

*authority of police officers of the respective cities in and for which they are severally appointed."* N. J. S. A. 40:184–3. Jurisdiction over playgrounds and recreation places has been assigned to the Department of Parks and Public Property, and at the time of institution of this action the defendant Joshua Ringle was the director of such department. *N. J. S. A.* 40:72–4, 5 and 6.

As far back as 1946 the city had employed a number of persons to work in playgrounds and recreation places. They were denominated laborers on the records of the Department of Parks and they were sworn in as special policemen. Their duties were to patrol and police such places and to maintain order.

In January 1950 the board of commissioners requested the Department of Civil Service to make a reclassification survey of its personnel. The basic idea was to set up proper classifications and designations of municipal employees according to their specific functions, to eliminate inconsistencies in job titles and inequities, if any, in salaries. The task was undertaken by the Department and was completed in December 1950.

According to the testimony of the civil service representatives, the *modus operandi* of their work was first to ascertain from each employee the specific nature of his duties and then to verify the description with his immediate superior and with the director of his department. From this base, the particular classification was fashioned. Approximately 400 class titles were included in the survey. The final report submitted to the city contained 201 printed pages and established job designations for 4,425 employees.

In the course of the study the civil service functionaries obtained information as to the employees of the playgrounds and recreation places, whose activities have been referred to above and who had been appointed special policemen and were classed as laborers on the records of the city. Their investigation disclosed that these men were actually performing the work of park patrolmen. Their duties, in the opinion of the classification technicians, were best described

by the title "Park Patrolman"—a title, according to the executive assistant to the president of the Civil Service Commission, "used in several other places throughout the State." This designation was recommended in the final report. And it was advised also that the principal superior of such workers should be called "Park Police Chief." It is undisputed that the titles originated in the manner explained.

The report was entitled "City of Jersey City Reclassification Survey." The duties prescribed for the classification in question were set forth therein as follows:

"Park Patrolman.
During an assigned tour of duty, patrols parks to assure the protection of life and property, prevents and detects crime; enforces laws and ordinances.
Park Police Chief.
Has charge of the discipline and the park police activities intended to provide protection of life and property, detection and prevention of crime, and the enforcement of laws and ordinances in City parks."

On May 1, 1951 the survey was adopted and the job classifications suggested were made effective by ordinance, entitled "An Ordinance Adopting Classification Schedule, Salary Range Schedule And Duties Classification Schedule Of The Employees Of The City of Jersey City, And Establishing And Creating In And For The Said City of Jersey City The Respective Offices And Positions Mentioned Therein." Section 1 provided:

"That the following classes of positions, duties of which are set forth as part of this Ordinance by reference to the 'City of Jersey City Reclassification Survey' prepared by the New Jersey Civil Service Department, now on file in the office of the City Clerk of Jersey City, are hereby created: * * *"

Two of the positions appearing in the schedule as part of the ordinance are: "Park Patrolman" and "Park Police Chief."

Since May 1951 the defendants have borne the designations assigned to them. They wear uniforms adorned with

badges inscribed "Park Police"; they carry weapons, and they have some patrol cars and other recognized police equipment. Appellant contends that the city has no authority to establish such a police unit and that the ordinance (as well as some amendatory enactments concerning the same subject) is void insofar as it undertakes to do so. It is uncontradicted that the defendants actually engage in the work described. And no proof was introduced to show that the number of patrolmen appointed represents arbitrary or unreasonable action on the part of the governing body.

Power to employ these men is predicated upon *N. J. S. A.* 40:184–1 and 3, *supra*, which, as has been said, permit the employment of the number of "custodians and assistants" considered necessary who, upon appointment, become endowed with "all the powers and authority of police officers" of the city for the purpose of preserving order and the observance of rules and regulations in the playgrounds and recreation places. Relying on this authorization the city maintains that the plaintiff's attack on the legality of its action is simply an exercise in semantics.

There can be no doubt that if these defendants had been called "Custodian" and "Assistant Custodian," instead of "Park Police Chief" and "Park Patrolman," their positions would have been unassailable. Perhaps it would have been more appropriate to remain within the legislative terminology. However, the record does not reveal how many employees in all are engaged in the various types of work required in the operation and maintenance of the public places involved. If all of them had been named in accordance with the statutory language, it seems obvious that in the allocation of duties by the Director of Parks and Public Property some of them could have been assigned to police work exclusively. And functionally they would have been policemen. That course, if pursued, would have been a mere administrative detail into which the judiciary would not intrude. And if those so delegated had been uniformed and given a name such as "Park Guard" or "Park Patrolman" because the director felt that the psychological effect on the public would

be an aid in preserving order and conformity to rules and regulations, it is difficult to see how the plan could be considered as *ultra vires*. Nor should the use of the word "park" bring about that result. Its connotation is broad enough to include playgrounds and recreation places. *Hill v. Borough of Collingswood*, 9 *N. J.* 369, 375 (1952); *Priory v. Borough of Manasquan*, 39 *N. J. Super.* 147, 161 (*App. Div.* 1956); *Baird v. Board of Recreation Com'rs of Village of South Orange*, 108 *N. J. Eq.* 91, 98 (*Ch.* 1931), reversed on other grounds 110 *N. J. Eq.* 603 (*E. & A.* 1932); *Strock v. City of East Orange*, 80 *N. J. L.* 619, 622 (*Sup. Ct.* 1910), affirmed 82 *N. J. L.* 543 (*E. & A.* 1911); *Horn v. City of Minneapolis*, 182 *Minn.* 172, 234 *N. W.* 289 (*Sup. Ct.* 1930).

The titles of these employees are not the brain children of the city. As has been shown, they emanated in good faith from the Civil Service Department, which has broad power to classify kinds of employment and to provide designations for those engaged in the various classifications. *N. J. S. A.* 11:24–3. Ordinarily, the courts will not interfere with such action in the absence of an affirmative showing of arbitrariness. *Carls v. Civil Service Commission of N. J.*, 17 *N. J.* 215 (1955). It does not appear here that the city acted in bad faith in accepting the expert suggestions and in creating such positions by means of the ordinances under attack. On the contrary, the enabling statute clearly supplies authority to adopt the ordinance and to make the appointments thereunder. Having in mind the strong presumption in favor of validity of the action, our duty under the 1947 *Constitution, Art.* IV, *Sec.* VII, *par.* 11, and the legislative direction, *N. J. S. A.* 40:42–4, to construe liberally grants of power to municipal governments, we cannot sustain the plaintiff's charge of illegality.

A further argument is made that the ordinance of May 1, 1951 is void because it did not contain a description of the duties to be performed by the defendants. As has been noted, the reclassification survey detailing such matters was incorporated therein by reference. Included also in the

ordinance was a statement, which served as public notice, that the survey was on file in the city clerk's office. The report was over 200 printed pages long and manifestly would have been difficult, cumbersome and expensive to recite in and to publish with the ordinance. Incorporation by reference in such a situation was sanctioned by the Court of Errors and Appeals in *McKann v. Town of Irvington,* 133 *N. J. L.* 575 (*E. & A.* 1946). We believe the same rule should be applied here.

The other grounds of appeal presented have been examined. They suggest no meritorious reason for reversal. Accordingly, the judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.