57 N.J. Super. 13 (1959)
153 A.2d 757
THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND ANDREW G. SAPIENZA, PLAINTIFFS-APPELLANTS,
v.
DEPARTMENT OF CIVIL SERVICE OF THE STATE OF NEW JERSEY AND ISABELL CHURLIN SPENCE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 2, 1959.
Decided July 15, 1959.
*16 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Louis P. Caroselli, Assistant Corporation Counsel, argued the cause for appellants (Mr. Ezra L. Nolan, Corporation Counsel of the City of Jersey City, attorney; Mr. Caroselli, on the brief).
*17 Mr. Theodore I. Botter, Deputy Attorney General, argued the cause for respondent Department of Civil Service (Mr. David D. Furman, Attorney General, attorney).
Mr. Max A. Boxer argued the cause for respondent Isabell Churlin Spence.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs City of Jersey City and Andrew G. Sapienza appeal from a series of orders of the Department of Civil Service (Department) culminating in the reclassification of a position held by Sapienza from hospital administrator to administrative clerk, certifying Mrs. Isabell Spence to that position in place of Sapienza, and denying plaintiffs a hearing on the issues involved.
Mrs. Spence qualified by Civil Service examination for the position of administrative secretary in the Jersey City Department of Revenue and Finance and was appointed to that position in 1952. She continued in the position until June 1957, at which time it was eliminated (allegedly for economy reasons) and she was demoted to administrative clerk. She thereupon appealed to the Department of Civil Service, claiming that her demotion was politically motivated. While the appeal was pending the city further demoted her to senior clerk stenographer, and shortly thereafter removed her from the classified service altogether. These actions were based on an opinion given by counsel for Jersey City that the ordinance purportedly creating the position of administrative secretary was legally ineffective for the purpose, so that Mrs. Spence had not held a legally existent position and consequently had no civil service status.
The Department upheld the city's elimination of the post of administrative secretary, but ordered Mrs. Spence restored to the position of administrative clerk. It refused to consider the legality of her original appointment, holding that the issue could only be raised by directly attacking the validity of the ordinance in the courts.
*18 The Civil Service decision was rendered April 15, 1958. There was no further appeal by either side. However, Mrs. Spence was never reinstated as administrative clerk in the Revenue and Finance Department, for Jersey City purported to abolish that position also. Her appeal from this action was still pending when subsequent events rendered the issue moot, at least for the moment.
On July 14, 1958 Jersey City appointed Sapienza as a replacement for one Romanowski in a position it designated as hospital administrator. (The position of hospital administrator is considered by the Department to be "the highest occupational level in a hospital.") On the same day the city requested the Department to approve Sapienza's appointment as "Temporary  Pending Civil Service Examination." The Department, however, determined that the position to which Jersey City sought to appoint Sapienza was not one involving the extensive responsibilities and broad discretion attendant upon the position of hospital administrator, but rather was "on a clerical-semi-professional administrative level." It concluded that the duties involved in Sapienza's position were actually those of administrative clerk, and accordingly reclassified the position labelled by the city as "hospital administrator" to "administrative clerk."
The action so taken was based on an intra-departmental memorandum which stated that Sapienza lacked the education and experience required to perform the duties of a hospital administrator, and that (in the writer's opinion) it was "inconceivable to me that the duties being performed by Mr. Sapienza could be those of a Hospital Administrator." The writer therefore concluded that the position was, as noted above, "on a clerical-semi-professional level." This conclusion obviously stemmed from his personal evaluation of the tasks Sapienza performed  a determination which, in turn, was influenced to some extent by the writer's opinion of Sapienza's education and experience. We note in passing that Sapienza had attended the Rutgers University School of Business for three years.
*19 After reclassifying the position the Department temporarily certified Sapienza as administrative clerk. The following day, however, it permanently certified Mrs. Spence to the latter position from the reemployment list for administrative secretary, thereby replacing Sapienza. As already noted, Mrs. Spence had not yet  despite the Department's earlier order  been restored to the position of administrative clerk in the Jersey City Revenue and Finance Department. Consequently, she was still on the reemployment list for administrative secretary (the position she had held for five years and which had been abolished for economy reasons), and thereby had a prior right to any vacancy in a similar position. N.J.S.A. 11:22-10.1 and 10.2. The Department of Civil Service determined that this reemployment list was suitable to fill an opening in the lower position of administrative clerk.
Jersey City protested this action in a letter to the Department. It argued that the duties of the position it had designated as "hospital administrator" were in no way similar to those of administrative clerk. The former position, it contended, was one of high responsibility and wide discretion, involving complete supervision over 2,800 hospital employees, whereas an administrative clerk exercised comparatively little discretion and authority. It also repeated its claim that Mrs. Spence had no civil service status, and thus no reemployment rights, because the position she purportedly had held was legally non-existent. Further, said the city, if she did have reemployment rights, they did not extend beyond the Revenue and Finance Department. Although, as we have remarked, Jersey City's original application envisioned a competitive examination before a hospital director was permanently appointed, it now maintained that the position was one of "head of a department," and should therefore be unclassified. The city requested a hearing on all issues.
The Department denied the request because "there are no grounds for * * * appeal." This decision was apparently *20 based on another intra-departmental memorandum in which the writer informed the Director of Executive Services that Sapienza did not, nor did his predecessor Romanowski, "perform the duties normally assigned to a Hospital Administrator." The medical director, it was said, is the functional and titular head of the hospital, whereas his executive assistant operated "in a supervisory capacity in non-professional areas." The memorandum went on to state that from the writer's own knowledge the duties performed by the executive assistant are identical with those performed first by Romanowski and now by Sapienza. These are duties of the same kind as Mrs. Spence had performed as administrative secretary in the Revenue and Finance Department. Thus, since Sapienza performed only duties similar to those of an administrative clerk, the position to which he had temporarily been appointed was held to be substantially identical with that of administrative clerk.
The memorandum also pointed out that the Department had in 1951 denied a request to place the executive assistant in the unclassified service as a department head. Since Sapienza was performing the same duties he, too, should remain in the classified service. The city's restrictive interpretation of Mrs. Spence's statutory reemployment rights was also rejected.
We deal with plaintiffs' contention that the position of administrative secretary had no legal existence, that Mrs. Spence therefore acquired no civil service status by performing the duties of that position for five years, and thus she has no reemployment rights.
We shall first consider the intent and effect of the ordinance which purported to create the position of administrative secretary in the Jersey City Revenue and Finance Department; next, assuming the ordinance was not legally effective to create this position, was Mrs. Spence nonetheless a de facto holder of a position; and finally, whether as a de facto holder of a position she acquired the reemployment rights assured in N.J.S.A. 11:22-10.1 and 10.2.

*21 I.
In 1950 the disorganized state of Jersey City's personnel system became a cause of concern to the city commissioners. Ad hoc appointments, without a continued and systematized updating of the original civil service classifications, had over the years wrought chaos. The legal status of many employees was in doubt, lines of command were tangled, and the relationship between positions was unclear. To alleviate the situation the Department of Civil Service was requested to undertake a comprehensive reexamination and reclassification of the positions of Jersey City's 5,425 employees.
The Department, with the full cooperation of city officials, thereupon made a thorough study of the duties performed by each employee and the needs of each municipal department. In December 1950 it presented its City of Jersey City Reclassification Survey to the board of commissioners "in form appropriate for adoption * * *." The survey contained a description of each newly designated position, the number and names of the employees who would fill the positions (based, of course, on the duties already being performed by them), and the salary ranges of the positions. Isabell Churlin (now Isabell Churlin Spence) was designated for one of the two positions of administrative secretary.
On May 1, 1951 the Jersey City Board of Commissioners adopted Ordinance K-1322 which  at least so it appeared  adopted and put into effect the reclassification schedule. The ordinance recites the desire of the city to cooperate with the Civil Service Commission, establish a business-like personnel system, and remedy threats to the job security of many of its employees. The ordinance then declares:
"1. That the following classes of positions, duties of which are set forth as part of this Ordinance by reference to the `City of Jersey City Reclassification Survey,' prepared by the New Jersey Civil Service Department, now on file in the office of the City Clerk of Jersey City, are hereby created; and
2. * * * [T]hat the salary ranges setting forth annual increments specified in the attached schedule are hereby adopted as *22 and for each and every class of position mentioned in said schedule, * * *."
The ordinance listed each position recommended by the reclassification survey, including those of administrative clerk and administrative secretary, and gave the salary range for each. It did not indicate the number of positions in each classification.
In December 1952 Mrs. Spence, who had served as a senior clerk-stenographer since 1949, was appointed administrative secretary after qualifying in a competitive examination for that position.
Although Jersey City has since 1951 acted upon the assumption that Ordinance K-1322 created the positions listed, in the number indicated in the reclassification schedule, it now maintains that the enactment did not create any position, but merely set out classifications that would apply to such positions as might subsequently be created by ordinance. It finds support for this argument in the failure of the ordinance to list the number of positions in each classification  a defect which, it maintains, in itself renders the ordinance nugatory insofar as creating any positions in the city service is concerned. From the premise that Mrs. Spence has held a legally non-existent position, plaintiffs reason that her civil service status, and thus her reemployment rights, are likewise non-existent.
It must be kept in mind that Mrs. Spence does not seek reinstatement to the position of administrative secretary in the Revenue and Finance Department. What she seeks is appointment to a completely different position, one designated by the city as hospital administrator, and redesignated by the Department of Civil Service as administrative clerk. This position has a conceded legal existence. It was apparently created by an ordinance enacted subsequent to the 1951 ordinance mentioned above. The only significance in this case of the position of administrative secretary in the Revenue and Finance Department is that Mrs. Spence's reemployment *23 rights, and thus her right to the position she now claims, rest on her having been appointed to and served in that position for five years.
The view taken by plaintiffs is manifestly unfair, not only with regard to Mrs. Spence but also as it might affect any number of other Jersey City employees. This consideration, reinforced by our conclusion that plaintiffs' argument is basically without merit, impels us to bypass the procedural question of plaintiffs' right to raise the question of the legal efficacy of the ordinance in an appeal from the decision of an administrative agency (compare Swede v. City of Clifton, 39 N.J. Super. 366, 373-374 (App. Div. 1956), affirmed 22 N.J. 303 (1956) with Handlon v. Town of Belleville, 4 N.J. 99 (1950); Grunewald v. Weehawken Twp. Committee, 18 N.J. Super. 401 (App. Div. 1952); Weaver v. North Bergen Twp., 10 N.J. Super. 96 (App. Div. 1950), reversed on other grounds, 6 N.J. 475 (1951)), and to dispose of the issue on its merits.
We have no doubt that Jersey City intended to create the positions listed in the ordinance in question, and indeed believed that it had legally and effectively done so. The introductory paragraphs clearly show that the ordinance was not designed merely as a framework of classification for positions subsequently to be established, but was to be the means of putting into effect the Civil Service Department's recommendations by actually creating the positions. Particularly significant is the seventh of these paragraphs:
"WHEREAS, the Board of Commissioners of the City of Jersey City feels that the legal creation of positions held by employees of the City of Jersey City will provide the security necessary for proper working relations between the [Commissioners] * * * and the employees of the City of Jersey City, resulting in a more efficient administration of the City's affairs and the providing of better services for the community at large; * * *." (Italics ours)
Plainly, the ordinance was intended to provide a solid legal foundation for positions whose validity was doubtful  a problem which had partially motivated the reclassification *24 study  and the words we have italicized gave notice of that fact to all interested parties.
There are specific provisions in the enacting paragraphs to the effect that the ordinance should not act to decrease the pay of any employee or to increase beyond the normal increment the pay of anyone then receiving less than the minimum level. Further, the ordinance was not to affect any employee who had already received an increment in 1951. All this indicates that as concerns the creation of positions, the ordinance was to have a present rather than a future effect. Considered in the light of these provisions it is clear that the words, "the following classes of positions * * * are hereby created," in paragraph 1 of the body of the ordinance, quoted above, purported to effect a present creation of positions  an integration into the new classification of all those jobs which had developed haphazardly in the past.
What, then, of the failure to specify the number of new positions created in each classification? In Mullin v. Ringle, 27 N.J. 250 (1958), our Supreme Court dealt with a somewhat similar attack on this same ordinance. There it was held that the necessarily cumbersome and expensive procedure which would have been required to reproduce the 201-page description of the duties of the various positions justified the ordinance's incorporation by reference of the schedule of duties contained in the reclassification survey. This rationale would not, of course, justify the failure to include in the ordinance an indication of the number of positions created in each classification. Further, the ordinance under consideration does not in terms refer to the schedule as an indication of the number of positions created.
In Hale v. Town of Kearny, 99 N.J.L. 334 (Sup. Ct. 1924), the failure of an ordinance to indicate the number of positions it purported to create was held to be a defect fatal to the lawful creation of any such position. And see Nolan v. Witkowski, 56 N.J. Super. 480 (App. Div. 1959), just decided. Thus it may be that the ordinance is open to attack. But does it follow from this, as plaintiffs contend, *25 that Mrs. Spence, who for years performed the duties of a "position" purportedly created by this ordinance, has acquired no civil service reemployment rights? We are clear that it does not.
The problem involved in this case is different from that which arises when a party claims a right to occupy a position which was not legally created. See, e.g., Handlon v. Town of Belleville, Hale v. Town of Kearny, above. As we have observed, plaintiffs do not challenge the legal existence of the position to which the Department of Civil Service has certified Mrs. Spence  that which the city designated as hospital administrator and the Department has reclassified as administrative clerk. Their argument on the basis of the Handlon case, that there is no res over which the Department has jurisdiction, is misplaced; the res is the position which has been occupied by Sapienza and to which the Department has certified Mrs. Spence. The conceded legal existence of this position is what distinguishes the present case from Handlon, where the position to which the employee sought to be restored was held to have no legal existence.
Further, as concerns the creation of the position of administrative secretary in the Revenue and Finance Department, the legality of which plaintiffs do challenge, we are not called upon to pass on someone's right to hold and receive the emoluments of that position since Mrs. Spence's claim to such a right has been determined against her. The position has been legally abolished; as said, the only benefit she now seeks from that position is the reemployment rights created by statute.
The paying out of public funds to one purportedly rendering service to the municipality is a matter that has led our courts to adopt a strict view of the requirement that an ordinance express with certainty the obligations to be undertaken by the taxpayers. Davaillon v. City of Elizabeth, 121 N.J.L. 380 (Sup. Ct. 1938); Hale v. Town of Kearny, above. However, two distinct policies are confused by plaintiffs' argument, which proceeds from the premise that the *26 ordinance is subject to attack for failure to comply with the requirements of full notice to the taxpayers, to a conclusion that one who in good faith holds a position presumably created by such an ordinance obtains no civil service reemployment rights.
The policies underlying the Civil Service Act are well known. They seek to establish an enlightened and efficient personnel system in government, assuring the taxpayers of the services of a body of employees advancing on the basis of merit and seniority, and immune from political vicissitudes. See State v. Clark, 15 N.J. 334, 341 (1954); Kaplan, The Law of Civil Service, pp. 1-29 (1958). It is these policies, too, which undoubtedly led the Legislature to decree that one whose job is eliminated for any reason should be placed on a reemployment list, with priority to fill any subsequent vacancy arising in a similar job. N.J.S.A. 11:22-10.1 and 10.2. Although the basis for such a priority right is, of course, the employee's having held a civil service position, the legislative policy as well as one's sense of fair play would be ill-served by depriving one of that right because the ordinance purporting to create the former position was defective in some respect.
Where an employee like Mrs. Spence  who had been an employee of the municipality prior to the creation of the position here in question  qualified for the putative position by competitive examination, served in it, and gained valuable experience, sensible personnel practice and justice to the individual demand that she have a prior right to any similar position where her training can be of value to the city. We can see no reason in policy why a municipality's failure to conform to a requirement aimed at taxpayer enlightenment should, in the area of civil service rights, where policy considerations are completely different, have such an unreasonable and drastic effect as plaintiffs contend for.
To determine whether this harsh result must inexorably follow as a matter of law from a conclusion that the 1951 ordinance was legally ineffective to create the position of *27 administrative secretary, we turn to a consideration of the ancient doctrine of de facto officers. If Mrs. Spence is entitled to claim reemployment rights regardless of the legal effect of the ordinance in question, there is no reason for us to pass upon the latter question. We consider such to be the case.

II.
The de facto concept is a product of judicial invention based on considerations of policy and public convenience rather than the dictates of strict logic. Constantineau, De Facto Doctrine, § 3, p. 5 (1910). It has been a part of the common law since at least 1431, when the first case appeared in the Year Books, Ibid., § 5, p. 9; and State v. Carroll, 38 Conn. 449 (Sup. Ct. Err. 1871), the leading case on the subject, tracing the development of the doctrine from the earliest published reports.
In Carroll, Chief Justice Butler set out the following comprehensive definition of a de facto officer:
"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised,
First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be.
Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.
Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.
Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such." (38 Conn., at pages 471-472)
As the court remarked in De Fazio v. Mayor, etc., of Hoboken, 12 N.J. Super. 515, 519 (App. Div. 1951), this definition *28 "has had a remarkably concordant decisional lineage." See, e.g., Von Nieda v. Bennett, 117 N.J.L. 231 (E. & A. 1936); State v. Zeller, 83 N.J.L. 666, 670 (E. & A. 1912); Erwin v. Jersey City, 60 N.J.L. 141, 144 (E. & A. 1897). And in Earruso v. Board of Health of East Hanover Twp., 120 N.J.L. 463 (Sup. Ct. 1938), the court, in speaking of the actions of a public agency which had no de jure status, said:
"[It] had the reputation of being the public agency it professed to be and of possessing the authority vested by law in such bodies. And it is the settled rule that, where the public need or convenience or the rights of innocent third parties so dictate, the acts of a de facto public body, functioning within the allotted sphere, are treated as valid. The public interest is served by the recognition of its acts in the discharge of functions conferred by law upon like bodies having de jure existence." (at page 467)
Although Mrs. Spence had the reputation of being a public official and possessing the authority purportedly vested in such position while she was administrative secretary, and the public convenience and the rights of innocent third parties who may have been affected by her actions in that capacity certainly would demand that she be treated as a de facto officer and her official actions deemed valid, there is an additional factor to be considered. It is that the position she purported to occupy assumedly had no de jure existence. We turn, then, to the question of whether there can be a de facto holder of a position which has no de jure existence. (Incidentally, the distinction often made between an "office" and a "position" is of no particular pertinence here, and the terms may be used interchangeably.)
Although contrary views may obtain in other jurisdictions, this State is firmly committed to the proposition that where public convenience so requires, there may be a de facto officer without a de jure office. In the leading case of Lang v. City of Bayonne, 74 N.J.L. 455 (E. & A. 1907), the Bayonne police department had by statute been removed from the control of the mayor and council and placed under *29 the jurisdiction of a newly created board of police commissioners. This board had power to appoint and, for good cause, to remove members of the police department. In the exercise of this power it discharged plaintiff, a city policeman, for misconduct. The statute was subsequently held unconstitutional, and plaintiff brought an action for reinstatement. He urged that the invalidity of the statute rendered the board legally non-existent, and so its actions were nugatory. To the argument that the board was a de facto body and its actions valid as to third parties, he countered that there can be no de facto incumbent of an office which has no legal existence.
Notwithstanding the earlier New Jersey holding in Flaucher v. City of Camden, 56 N.J.L. 244 (Sup. Ct. 1893), the view taken by the United States Supreme Court in Norton v. Shelby County, 118 U.S. 425, 62 S.Ct. 1121, 30 L.Ed. 178 (1886), and the preponderance of out-of-state authority  all to the contrary  Chief Justice Gummere, speaking for a unanimous court, held that there can be a de facto holder of a legally non-existent position. The actions of such persons are as fully binding with respect to third parties as are the acts of a de facto holder of a de jure office. The Chief Justice emphasized what he considered the right, and even the duty, of the public to follow the dictates of any statute until such time as it is judicially declared invalid, and also stressed the great inconvenience which would result if third persons were constantly called upon to satisfy themselves as to the validity of a statute before they accommodated their actions by its mandate. He drew support for his argument from the opinion in State v. Carroll, above, which in his view indicated that a de jure office was not a sine qua non of a de facto officer. Consult, in this connection, the fourth part of the definition quoted above from Carroll which seems to support such a holding.
In Hyman v. Long Branch Kennel Club, Inc., 115 N.J.L. 123 (E. & A. 1935), the court took exception to the breadth of some of the language in Lang which implied that an *30 unconstitutional statute should be deemed binding on everyone until judicially declared invalid. The court considered this language to be dictum, and indicated that the Lang holding was only that an officer appointed under a statute later held invalid is a de facto officer; his actions prior to such determination are valid insofar as they involve the interests of the public and of third persons. Thus, although the broad rule of Lang as to the binding effect of unconstitutional statutes before they are declared invalid was modified, the doctrine which concerns us here  that there may be a de facto officer without a de jure office  was reaffirmed and even strengthened. This is so because the court in Hyman held, contrary to at least the inferences deducible from Lang, that an unconstitutional statute is void from its inception, and the public is not bound by it even prior to a judicial holding to that effect. Nonetheless, the court agreed that one holding what purports to be a position created by the statute is a de facto officer.
The Lang case is commented on in the annotation, "De jure office as condition of a de facto officer," 99 A.L.R. 294 (1935). The writer there states that "the weight of authority supports the general doctrine that the existence of a de jure office is a necessary condition of a de facto officer," but cites Lang v. Bayonne as "a strong case upholding the de facto character of incumbents of de facto offices." 99 A.L.R., at page 306. Later in the annotation this case is described as a rejection of "the doctrine that a de jure office is a condition of a de facto officer." (page 314)
Some doubt may indirectly have been cast on the validity of the holding in Lang by the decision in Corb v. Board of Health of Nutley, 101 N.J.L. 50 (Sup. Ct. 1925). Nutley had in 1912 adopted the commission form of government prescribed by the Walsh Act. Notwithstanding that statute's express direction that upon adoption of the new form of government all preexisting municipal bodies are "ipso facto abolished," the previously established board of health continued to function after the adoption of the commission form. *31 In 1914 the board enacted the code which defendant was subsequently convicted of violating. The Supreme Court held the code to be without force and effect because the health board had no legal existence after the adoption of the new form of government; "they were neither de jure nor de facto officers, and their acts were nullities." The court failed to indicate why, under the principle of the Lang case, the board should not have been treated as a de facto body, and in fact cited that case as authority for its holding.
In Toomey v. McCaffrey, 116 N.J.L. 364 (Sup. Ct. 1936), Chief Justice Brogan, by way of dictum, noted the conflict between the holding in Lang and some of the other authorities in this country, and impliedly cast some doubt upon its validity. Toomey was a quo warranto proceeding brought by one who had held the position of comptroller of the City of West New York and who sought to affirm his rights to that position under the Veterans Tenure Act. Since the position had been created by resolution rather than ordinance, the court held that there was no legally existing position of comptroller to which the relator could lay claim. The Chief Justice then suggested that one might ask whether the relator, as a de facto officer, could acquire rights to this position. "That consideration," he said, "immediately raises the question as to whether there can be a de facto officer when a de jure office does not exist." He noted three cases from other jurisdictions which had held in the negative, and then declared that "a contrary view is expressed in * * * State v. Carroll, 38 Conn. 449; Lang v. Bayonne, 74 N.J.L. 455, which last case was in part overruled in Hyman v. Long Branch Kennel Club, Inc., 115 Id. 124." However, since the parties had not raised the point, the court found it "unnecessary to pursue this inquiry."
Whatever doubts may have been engendered by the Corb and Toomey cases as to whether the Lang doctrine was still good law in this State were swept away by the decision in Byrnes v. Boulevard Commissioners of Hudson County, 16 N.J. Misc. 141 (Circ. Ct. 1938), affirmed, 121 N.J.L. 497 *32 (E. & A. 1939). There a statute had purported to abolish the offices of the county boulevard and park commissioners, establishing in their place a new county park commission with members to be appointed by the Governor. Such members were appointed and they prevailed in an action brought in the Supreme Court to oust the old boulevard and park commission. They then discharged the plaintiffs, holders of various positions under the former commission, in the interests of economy. Thereafter the Court of Errors and Appeals reversed the Supreme Court judgment, declared the statute unconstitutional, and restored the previous commissioners to their offices. Plaintiffs were then reinstated, and they brought suit for the salary they would have earned during the time they were prevented from rendering services.
In an extensive opinion the Circuit Court held that Lang v. Bayonne was still the law of New Jersey. The members of the county park commission were de facto officers, even though their offices had no de jure existence. Their discharge of the plaintiffs was therefore a valid and binding act, and consequently plaintiffs could not recover lost salary since they had not been unlawfully discharged. Referring to the statement in the Toomey case  that Lang had been partially overruled by Hyman v. Long Branch Kennel Club, Inc.  the court pointed out that the latter case specifically approved that portion of the Lang opinion which held that there can be a de facto officer even in the absence of a de jure office.
On appeal the Court of Errors and Appeals unanimously affirmed, quoting from the decision in Hyman v. Long Branch Kennel Club, Inc., above, where the Lang holding had been described as follows:
"* * * An officer appointed under authority of a statute, to fill an office created by that statute is at least a de facto officer, and acts done by him antecedent to a judicial declaration that the statute is unconstitutional are valid, so far as they involve the interests of the public and of third persons." (121 N.J.L., at page 499)
*33 The court then noted that the holding of Lang has never been overruled, although contrary views might obtain in other jurisdictions. It concluded that prior to the decision invalidating the statute which created their positions, the new commissioners clearly constituted a de facto body.
We have not overlooked the fact that it has sometimes been said in this State that there cannot be a de facto officer without a de jure office. Jersey City v. Department of Civil Service, 7 N.J. 509, 525 (1951); Van Brookhoven v. Kennedy, 125 N.J.L. 178 (Sup. Ct. 1940), affirmed 125 N.J.L. 507 (E. & A. 1941); Wagner v. Lodi, 56 N.J. Super. 204 (App. Div. 1959). However, in those cases the statement was made concerning the right of one holding a legally non-existent position to be reinstated to that position. Since the position had never been created, the claim was, of course, rejected in each case. The courts were not persuaded by the claimants' arguments that by holding these legally non-existent positions, they had somehow raised themselves by their bootstraps and converted the "positions" into something which had legal existence and to which they had legal claims. To apply the de facto doctrine in any such situation would completely subvert the legislative policy requiring municipalities to establish positions by ordinance only. It is in this context that our courts have sometimes said that there can be no de facto officer without a de jure office  an accurate statement of the law in the circumstances.
That the statements we have just discussed were not intended to have a general application to every situation in which the question arises as to whether a person is a de facto officer, is clear from a careful reading of the language of Handlon v. Town of Belleville, 4 N.J. 99 (1950), a case cited as authority for the statements made in the Jersey City v. Department of Civil Service and Wagner v. Lodi cases. In Handlon, Justice Heher expressly limited his language to the context of the case then before him. Rejecting plaintiff's attempt to be reinstated in a position which had never been created by ordinance, he said, "It is the *34 general rule that there cannot be a de facto officer without a de jure office" (emphasis added), and then noted, "There is no reason of public policy for a deviation from the rule here." (4 N.J., at page 109) The clear implication of this language is that reasons of public policy would justify a different conclusion in other circumstances.
There is no indication that the holdings in the Lang and Byrnes cases are in any way disapproved, either in Handlon or in any of the cases that followed it and cited it as to the relation between a de facto officer and a de jure office. The holdings of these latter cases are completely inapplicable to the question now before us.
We therefore conclude that during the time Mrs. Spence held the position of administrative secretary she was at least a de facto officer, and the official acts she performed in that capacity would be valid and binding as to third parties and the public. Or, to phrase the proposition differently, Mrs. Spence was the de facto holder of a de facto position. To deny the legal effect of her acts could only lead to confusion and to the mischief which the de facto doctrine was designed to prevent. The absence of a de jure position must therefore be considered as not fatal to Mrs. Spence being considered a de facto officer. As the court said in Harrison v. Borough of Madison, 81 N.J.L. 21, 22-23 (Sup. Ct. 1911), affirmed 82 N.J.L. 527 (E. & A. 1911), when considering the de facto status of one entitled "Acting Mayor":
"He may not fall within the precise definition hitherto given of a de facto officer, but the underlying principle is similar, and the public policy to be regarded and conserved is the same."

III.
Having now determined that Mrs. Spence was a de facto holder of a position, we proceed to consider whether she thereby acquired reemployment rights within the meaning of N.J.S.A. 11:22-10.1 and 10.2. Can the de facto holder *35 of a position obtain any rights for herself, or is the de facto doctrine applicable only to a consideration of the officer's relation with third parties and the public? If the doctrine is broad enough to provide benefits for the putative holder of the position, is it appropriate that the particular benefits sought by Mrs. Spence be extended to her as a de facto holder of a de facto position?
Since the genesis of the de facto doctrine lay in the policy demanding that governmental actions not be hampered by collateral inquiries as to the legal status of the officer performing the acts, it is not surprising to find Constantineau in 1910 declaring that the de facto officer himself receives no benefit from his holding a position. Constantineau, De Facto Doctrine, § 203, p. 285 (1910). The author declares that "it is manifest that an officer de facto cannot recover the compensation annexed to an office, and such is the rule almost universally recognized." Ibid., § 236, pp. 330-331. He adds:
"* * * The fact that an officer de facto has entered into an office and performed its duties bona fide, believing himself rightfully entitled to it, will be of no assistance to him in an action by or against him to recover the official salary." Ibid., § 234, at page 329.
Thirteen years earlier, however, our Court of Errors and Appeals, in Erwin v. Jersey City, 60 N.J.L. 141 (E. & A. 1897), had departed from the "almost universally recognized" rule and held that "one who becomes a public officer de facto without dishonesty or fraud, and who has performed the duties of the office, may recover such compensation for those services, as is fixed by law, * * *." (at pages 149-150) Erwin had been appointed to the office of corporation attorney of Jersey City by the board of finance. One member of the board, whose vote was necessary for the appointment, was subsequently adjudged to be a usurper and was ousted in quo warranto proceedings. Prior to the ouster Erwin had in good faith entered upon and performed the functions of his office. Thereafter he sought to recover *36 salary for the period of his service. The Supreme Court denied the claim, holding, first, that the de facto board of finance could not give plaintiff a de jure status, and second, that although he was a de facto officer he could not recover compensation for his services.
On appeal the Court of Errors and Appeals specifically bypassed the first question but reversed on the second issue. The court dealt first with the question of whether Erwin was a de facto officer. The constitutionality of the statute authorizing the appointment of a corporation attorney and the fact that one member of the board of finance had no de jure status, were considered immaterial issues. Since the official body had apparent authority to appoint plaintiff to office, had apparently exercised such authority, and the appointee had entered upon and performed the duties of the office, the court held he was a de facto officer. His acts were "valid in respect to the public, whom he represents, and to third persons, with whom he deals officially, notwithstanding there was a want of power to appoint him * * *." (60 N.J.L., at page 144).
Moving next to the question of whether plaintiff, as a de facto officer, was entitled to recover any salary, the court relied to a great extent on Stuhr v. Curran, 44 N.J.L. 181 (E. & A. 1882). That case involved an action by the de jure holder of an office against the de facto officer who had performed the duties of the office, to recover from the latter the compensation he had received from the municipality. The court held that plaintiff could not recover the salary merely because he had legal title to the office. Stuhr did not involve a claim against a municipality and therefore is not a precise holding that a de facto officer requires some personal rights vis-a-vis the municipality by his abortive appointment. Nevertheless the Erwin court considered its former decision as at least persuasive authority on the issue then before it. The court noted that its holding in Stuhr was "somewhat at variance with those of the courts of other states," but concluded that it was in the "highest *37 degree reasonable" that the de facto holder of a position who actually rendered service in good faith should receive the compensation of the office. Since Erwin had done just that, the decision of the Supreme Court was reversed and plaintiff's claim sustained.
Erwin v. Jersey City, then, is a square holding that a de facto officer may, by his good-faith rendering of services, acquire rights against the municipality.
In Brinkerhoff v. Jersey City, 64 N.J.L. 225 (E. & A. 1900), the court reaffirmed the holding in Erwin. In that case, too, plaintiff had been appointed to a position by the vote of four members of the board of finance, one of whom held office without legal authority and was later ousted from the board. Plaintiff, after having served in the position to which he had apparently been appointed, sued to recover his salary. On the authority of Erwin v. Jersey City he was held to be at least a de facto officer, and thus entitled to recover his compensation. (After deciding this question the court felt called upon to go further and hold that the de facto board of finance  it had no de jure status since one member held office improperly  could, and in fact did, vest in plaintiff the de jure title to a position. This second holding was subsequently overruled in Von Nieda v. Bennett, 117 N.J.L. 231 (E. & A. 1936). See also Swede v. City of Clifton, 39 N.J. Super. 366, 371 (App. Div. 1956), affirmed 22 N.J. 303 (1956)).
The plaintiff in McArt v. Town of Belleville, 97 N.J.L. 396 (Sup. Ct. 1922), had been appointed a policeman by the commissioner who, under the Walsh Act form of government, had control of the police department. Plaintiff served in that position for some months, and when the town refused to pay him on the ground that appointments to the police department must be made by the entire board of commissioners, plaintiff sued for compensation commensurate with the services he had rendered. The court refused to decide whether the individual commissioner or the entire commission was the proper appointing authority. It held *38 that in any event plaintiff was at least a de facto officer who had rendered his services in good faith, and under the rule of the Erwin case he was entitled to compensation.
In 1925 the Legislature expressed its approval of the Erwin doctrine by enacting what is now R.S. 40:11-7. L. 1925, c. 239, § 1. The statute declares that
"Any person who has or shall have held, de facto, any office or position in the public service of any county or municipality, and who has or shall have performed the duties thereof, shall be entitled to the emoluments and compensation appropriate to such office or position for the time in fact so held and may recover therefor in any court of competent jurisdiction, notwithstanding any refusal or failure of any other person or officer."
The Assembly bill which became L. 1925, c. 239, had been vetoed by Governor Silzer. The Legislature then overrode the veto. In his veto message the Governor, in addition to objecting to what he termed the "obscure" language of the last clause of the bill, noted that the legislation seemed unnecessary "because there are abundant court decisions holding that a de facto officer who has performed the duties of the office is entitled to compensation." Minutes of Assembly (1925), p. 1140.
The 1925 statute seems to have received scant attention, for it was not mentioned in at least two subsequent cases in which a de facto officer was held to be entitled to compensation. Petrone v. City of Newark, 19 N.J. Misc. 318 (Sup. Ct. 1941); Freudenreich v. Borough of Fairview, 14 N.J. Misc. 804 (Sup. Ct. 1936). But see DeFazio v. Mayor, etc., of Hoboken, 12 N.J. Super. 515, 522 (App. Div. 1951). On the right of de facto officers to compensation see, generally, 93 A.L.R. 258 (1934); 151 A.L.R. 952 (1944).
In Shibla v. Wall Township, 136 N.J.L. 506 (Sup. Ct. 1948), affirmed 137 N.J.L. 692 (E. & A. 1948), an additional benefit was extended to a de facto officer. There the municipality contended that it had the right to dismiss at will its chief of police, an honorably discharged veteran, notwithstanding the provisions of the Veterans and Police *39 Tenure of Office Acts (N.J.S.A. 38:16-1 and N.J.S.A. 40:47-6), because he was beyond the eligible age at the time of his appointment. Both the Supreme Court and the Court of Errors and Appeals held that the protections of these acts extend to both de jure and de facto officers. If the township sought to remove the officer because of his ineligibility at the time of appointment, it must proceed to oust him by quo warranto.
In Shibla both courts cited as authority for their holdings the case of Magner v. Yore, 75 N.J.L. 198 (Sup. Ct. 1907). There the City of Bayonne had appointed plaintiff to the office of chief of police, and he served in that capacity until 1906. The city then attempted to discharge him without providing him with a statement of charges and affording him a hearing, as required by the Police Tenure Act. In justification of its action the city maintained that at the time of his appointment plaintiff did not possess the requisite statutory qualifications for the office, and consequently the appointment was without legal effect. The court did not pass on this point. Instead, it held that whether or not plaintiff's appointment was legally valid, he was at least a de facto officer and as such entitled to the protections of the tenure act. That act, said the court, "makes no distinction between officers de facto and officers de jure. The object of the legislation was to improve the character and discipline of the police force by securing the members in their positions during good behavior and to prevent their removal for partisan and personal reasons not affecting their character or efficiency as policemen. These reasons are quite as applicable to de facto officers as to officers de jure." (75 N.J.L., at page 199.) If plaintiff's appointment was illegal, the city must proceed by quo warranto to oust him.
On the basis of the line of cases beginning with Erwin v. Jersey City, and particularly with regard to the last two cases discussed, Shibla v. Wall Township and Magner v. Yore, it is clear that the de facto doctrine is sufficiently broad to justify a reading of the language of N.J.S.A. 11:22-10.1 *40 and 10.2  the basis for Mrs. Spence's claim to reemployment rights in a position similar to that which she purported to hold for five years  as extending the rights thereby created to one who has been a de facto holder of a position. As to whether those rights should be extended to a de facto officer in the position of Mrs. Spence, the question must turn on considerations of policy and public convenience  the elements which have been responsible for the birth and continued development of the de facto doctrine.
In DeFazio v. City of Hoboken, 12 N.J. Super. 515 (App. Div. 1951), plaintiff, who had been aware that the Civil Service Department had refused to approve his appointment, was denied compensation for his services as a de facto officer. This court said that "the doctrine pertaining to the activities of de facto officers had its origin in the policy of the public interest and protection. Not unlike many other beneficial doctrines of the law and indeed advantageous legislation, it is not permitted to be utilized for mischievous purposes." 12 N.J. Super., at page 520. See also, Von Nieda v. Bennett, 117 N.J.L. 231, 236-237 (E. & A. 1936), where it was held that the de facto doctrine would not be applied to give de jure status to an appointment made by a city commissioner whose election victory was contested and subsequently upset after a recount.
But when sound considerations of policy indicate the desirability of applying the de facto doctrine to new problems, our courts have not hesitated to do so. Erwin v. Jersey City, above, 60 N.J.L. 141 (E. & A. 1897); Lang v. City of Bayonne, above, 74 N.J.L. 455 (E. & A. 1907); Magner v. Yore, above, 75 N.J.L. 198 (Sup. Ct. 1907); and Shibla v. Wall Township, above, 136 N.J.L. 506 (Sup. Ct. 1948), affirmed 137 N.J.L. 692 (E. & A. 1948), all involved extensions of the doctrine beyond its original scope. See Blore v. Board of Freeholders of Union County, 64 N.J.L. 262 (E. & A. 1900), so describing the Erwin case and its forerunner, Stuhr v. Curran, 44 N.J.L. 181 (E. & A. 1882). See also the language quoted above from Harrison *41 v. Borough of Madison, 81 N.J.L. 21, 22-23 (Sup. Ct. 1910), affirmed 82 N.J.L. 527 (E. & A. 1911).
Before concluding this phase of the appeal we take note of three cases decided by our former Supreme Court, the language of which, on first reading, might seem to indicate that Mrs. Spence could not, as the de facto holder of a municipal position, acquire reemployment rights under the Civil Service Act.
In Salter v. Burk, 83 N.J.L. 152 (Sup. Ct. 1912), the relator had been appointed municipal clerk of Trenton as of January 1, 1910, for a three-year term. On June 20, 1911 the city adopted the commission form of government under the Walsh Act. Since that statute provided that upon adoption of the new form of government the terms of office of all officers should cease, Salter's tenure ended on that date. However, in order to insure a smooth transition to the new system the board of commissioners adopted a resolution providing that all officers then in the city service were to continue in their former capacities until further order. This omnibus resolution specifically declared that no personal rights or privileges were to be created by the temporary arrangement, nor was the resolution to be considered as effecting an appointment to any office or position. Subsequently, on October 2, 1911, the commission by resolution appointed Salter to the position of city clerk for a two-month period to end December 1, 1911. On November 7, 1911 the city adopted the provisions of the Civil Service Act, and on December 1, 1911, at the expiration of Salter's two-month term, the commission appointed one Thompson as city clerk. Salter brought certiorari to recover the position.
The court held that since the city charter required appointments to the position of city clerk to be for a term of three years, neither the omnibus resolution nor the later resolution which purported to appoint Salter for a two-month term constituted lawful appointments. The court rejected Salter's argument that since an appointment for less than three years was contrary to the city charter, his *42 appointment of October 2, 1911, should be construed as being for three years. It held that the resolution was wholly ineffective as far as concerned a lawful appointment to the position. Inasmuch as the position was vacant, Thompson's appointment was valid.
The court then declared that the Civil Service Act had no application to the case, having been adopted after the adoption of the Walsh Act, "and therefore the provisions of the latter act prevail against the former." Although it is difficult to understand just what the court meant by this last passage, it is at least clear that it considered the Civil Service Act inapplicable. Nevertheless, the court went on to say that the terms of that act could not apply to a mere de facto officer, but must be limited to the protection of officers de jure.
In Beattie v. Passaic County Board of Taxation, 96 N.J.L. 72 (Sup. Ct. 1921), the prosecutor in certiorari had been appointed secretary of the county board of taxation for a one-year term, to expire April 30, 1920. During that term one of the three members of the appointing board died and the other two could not agree on a successor to Beattie. The presiding officer of the board therefore directed Beattie to continue performing the duties of secretary after his term had expired. Subsequent to the expiration of Beattie's term a statute was enacted which provided that the "secretary appointed by the several county boards of taxation shall hold office during good behavior * * *." L. 1920, c. 348. Beattie contended that his status as a de facto officer at the time of the enactment of this statute gave him tenure in the office of secretary. The single justice sitting in the case disposed of the argument on the authority of Salter v. Burk, saying that the provisions of the Civil Service Act have no application to a de facto officer.
In Shalvoy v. Johnson, 84 N.J.L. 134 (Sup. Ct. 1913), Shalvoy was temporarily appointed as a court attendant in Essex County on November 27, 1911, to replace a man who had died. Under the provisions of the Civil Service Act *43 such a temporary appointment could be made only for a period not to exceed two months. Near the end of the two-month period the Civil Service Commission certified to the appointing authority a list of persons eligible for appointment to the position but, on representation that a change of personnel during the court term was undesirable, the Commission consented to Shalvoy's remaining until April 1, 1912. On March 14, 1912 there was enacted a supplement to the Civil Service Act which provided that officers of the County Courts "holding office or employment at the time of the introduction of this act shall not be removed therefrom" except in accordance with the provisions of the Civil Service Act. Shalvoy argued that since he had been holding office at the time of the introduction of the act, he could not be removed therefrom except in accordance with the provisions of the statute. The court characterized the case as "an attempt by a temporary appointee to remain permanently in office because he was illegally suffered to remain in the performance of his duties beyond the statutory period." It held that since, at the time the supplemental act took effect, the Civil Service Act prohibited Shalvoy's remaining in his temporary position for more than two months, he was not entitled to the protection of its terms. The court cited Salter v. Burk, for the proposition that the Civil Service Act protects only de jure officers.
The holdings of these cases are manifestly correct. In none of them had the alleged de facto officer received anything more than what was clearly intended and understood to be a temporary appointment. In fact, in the Beattie case the complainant had not even received a temporary appointment, but had merely been directed by one member of the board to perform the duties of the position pending an appointment. None of the men involved had a right to rely on the protection of the Civil Service Act. Their "appointments" clearly did not purport to give them such right, but they nevertheless attempted to parlay a temporary designation and the chronological coincidence of the enactment *44 of a statute designed to give tenure to regular office holders, into a permanent position. The refusal of the courts to sustain these claims are examples of the policy discussed above  that of refusing to apply the de facto doctrine to accomplish mischievous ends. The cases are clearly distinguishable from the one before us. Here the appointment authority intended, and the appointee foresaw, a permanent de jure appointment. The appointee qualified for the position following a competitive examination, was certified thereto by the Department of Civil Service, and served in good faith for a number of years.
The broad statement in the cases just discussed, that the Civil Service Act provides no protection for de facto officers, was not necessary to the decisions. Considered in the context in which it was made, the statement is clearly correct, but we see no reason to apply it in the circumstances here present.
The policy considerations involved in this case have been adverted to above and we shall not repeat them here. Suffice to say, they dictate that Mrs. Spence be granted reemployment rights. These considerations are similar to, if not identical with those which induced the courts in the Magner and Shibla cases to hold that a de facto officer obtained rights under the Veterans and Police Tenure Acts. The only distinction between those cases and the one now before us is that the position purportedly held by Mrs. Spence had no de jure existence. Since the line of cases beginning with Lang v. Bayonne and extending through Byrnes v. Boulevard Commissioners of Hudson County holds that this fact is not a bar to the application of the de facto doctrine, and we see no reason why it should lead to a different result in this case, we hold that the distinction is not material to a consideration of Mrs. Spence's reemployment rights.
Accordingly, we conclude that it is not necessary for us to determine whether or not the 1951 Jersey City ordinance was effective to create the de jure position of administrative secretary in the Revenue and Finance Department. Mrs. *45 Spence was at least a de facto officer, and as such is entitled to the reemployment rights established by N.J.S.A. 11:22-10.1 and 10.2.

IV.
We turn now to a consideration of plaintiffs' right to a hearing before the Department.
The question of whether an administrative agency is required to grant a hearing to affected parties before issuing an order is generally determined by inquiring whether the action is of a quasi-judicial nature, as opposed to an action of a legislative or executive (sometimes called ministerial) nature. Handlon v. Town of Belleville, 4 N.J. 99 (1950); New Jersey Manufacturers Cas. Ins. Co. v. Holderman, 54 N.J. Super. 260 (App. Div. 1959). If the action partakes of the judicial, our traditions of due process and fair play require that affected parties be afforded the benefits of notice and a hearing, along with the other essential concomitants of judicial action.
The essential inquiry as to whether an administrative action is quasi-judicial concerns "the nature of the final act and the character of the process and operation rather than * * * the general character" of the administrative body. Handlon v. Town of Belleville, above, 4 N.J., at page 104. It is by such an inquiry that we determine whether a hearing is necessary to guard against arbitrary administrative action. "The grouping of the particular function is determined by its essential quality, considered in relation to the historic guaranties against the use of arbitrary power." Ibid., at page 105. And although not every exercise of judgment or discretion represents an exercise of judicial power, yet "where the administrative tribunal is under a duty to consider evidence and apply the law to the facts as found, thereby exercising a discretion or judgment judicial in nature on evidentiary facts, the function is ordinarily quasi-judicial and not ministerial." Ibid.
*46 With these principles in mind, we proceed to examine the nature of the action taken by the Department of Civil Service in the case now before us.
We note, first, that once the Department reclassified the position designated "hospital administrator" as administrative clerk, the remaining decisions which led to Mrs. Spence's certification to that position were ministerial. These include the determination that the reemployment list for administrative secretary, upon which Mrs. Spence's name appeared, could appropriately be used to fill a vacancy in the lesser position of administrative clerk, and also the ultimate act of certifying Mrs. Spence instead of Mr. Sapienza. None of these actions required a consideration of evidence. They involved only the application of administrative discretion to facts which could not be disputed.
But as to the reclassification itself, the problem is more difficult. We have found no authority on the specific issue of whether a hearing must precede a Civil Service reclassification of a position. Some New York cases have declared that a reclassification is an administrative rather than a quasi-judicial act, but these remarks were made solely in considering the question of whether appeal from the agency was by certiorari or mandamus, and the review one of the entire record or limited to a consideration of whether the decision was arbitrary, corrupt or erroneous in law. See Simons v. McGuire, 204 N.Y. 253, 97 N.E. 526 (Ct. App. 1912); People ex rel. Schau v. McWilliams, 185 N.Y. 92, 77 N.E. 785 (Ct. App. 1906); People ex rel. Sims v. Collier, 175 N.Y. 196, 67 N.E. 309 (Ct. App. 1903). Annotation, 134 A.L.R. 1103, 1106 (1941).
Carls v. Civil Service Commission, 17 N.J. 215 (1955), is another case which considered the procedure to be followed in seeking review of a Civil Service reclassification. The positions of certain examiners in the Banking and Insurance Department had been reclassified. The affected employees sought review under R.R. 4:88-10, by petition for declaratory judgment addressed to the Appellate Division. *47 Although this court (31 N.J. Super. 39) and the Supreme Court passed on the merits of the case, both courts noted that the proper method of review was by appeal under R.R. 4:88-8. Justice Jacobs remarked that the latter section "was designed to deal with so-called quasi-judicial decisions or actions adjudicating the rights of particular individuals, whereas * * * [R.R. 4:88-10] was designed to deal with so-called quasi-legislative rules governing future conduct generally." (17 N.J., at pages 219-220) This necessarily implies that the court considered a reclassification a quasi-judicial action for purposes of appeal  but that determination is of but slight relevance to the question we are considering.
The basic issue before the Department was whether the position Jersey City had designated as "hospital administrator" should be redesignated "administrative clerk." To resolve this issue it was necessary to determine the nature of the position  more specifically, the duties and responsibilities attendant thereon. In this connection the Department considered that Sapienza's abilities and experience, as well as the work he performed each day under the title of "hospital administrator," were factors relevant to a determination of the nature of the position.
This reasoning was, of course, entirely logical. If Sapienza daily performed only tasks comparable to those carried on by persons designated as administrative clerks, it is reasonable to conclude that the position he held, although called "hospital director," should more properly be designated administrative clerk. And if it were so redesignated, it would also follow that Mrs. Spence, who had reemployment rights, should permanently be certified to the position in preference to Mr. Sapienza, who had none.
There was, however, a clear-cut and vigorous dispute as to a basic and determinative factual issue: What duties did Sapienza actually perform as so-called "hospital administrator"?
*48 The personnel action form submitted by Jersey City to the Department of Civil Service describes the duties of a hospital administrator as follows:
"Supervises all administrative, financial and maintenance procedure in the hospital. * * * Coordinates and supervises all services, both professional and medical, for the purpose of centralizing budget control, payroll procedures and purchase control. Supervises the preparation of periodic reports from all departments for the Director of the Department of Public Affairs. Supervises the activities of the Comptroller's Office in the setting up of accounts, expenditures, establishment of rates and fees. Is responsible for maintaining an adequate public relations program for the hospital and its services. Is responsible for the establishment of a modern, efficient personnel department with final authority subject to the Director of Public Affairs in all personnel actions. Is expected to engage in the activities of local, state and national hospital organizations. Supervises the preparation of modern, efficient, admission and discharge procedures of patients. * * * Acts in close relationship with the Deans of the Medical and Dental Colleges in the establishing and carrying out of all administration procedures mutually affecting both the college and city administration."
In its letter of August 28, 1958 protesting the Department's certification of Mrs. Spence to this position, Jersey City contended that the "office is invested with considerable responsibility and discretion of the widest scope. Attached to it is the authority to employ, dismiss, transfer and completely supervise approximately 2,800 employees, subject, of course, to the Civil Service laws." And in the same letter the city asserted that "Since July 14, 1958, Mr. Sapienza has been performing these duties and functions in an excellent, efficient and capable manner."
In direct contradiction to these allegations (which, if true, would indicate that the position of "hospital administrator" was vastly different from that designated "administrative clerk"), a staff member of the Department declared in an intra-departmental memorandum that Sapienza did not perform the duties ascribed to him, but actually did work comparable to that of an administrative clerk. The duties of *49 an administrative clerk were set out as follows in the 1950 Reclassification Survey:
"Has charge of a large clerical staff performing a specialized type of work and/or does varied and difficult clerical work involving some elements of trouble shooting with responsibility for the work of others and requiring the frequent use of independent judgment."
The conclusion drawn by the departmental staff member was based in part on his belief that Sapienza did not have the qualifications to perform the duties described for the position of hospital director, and in part upon his "personal knowledge" as to the work actually performed by Sapienza.
Since Civil Service could reclassify the so-called "hospital administrator" position only if it found that the actual duties and responsibilities of the job were comparable to those of an administrative clerk, the Department was forced to consider the evidence before it and determine whether its staff member was correct in his opinions and conclusions, or the city in its representations. When, and only when, it had done this, could it apply the law to the facts and redesignate or refuse to redesignate the position. This procedure is precisely that which is described in Handlon as "quasi-judicial and not ministerial," and therefore requiring a hearing.
Instead of granting plaintiffs' request for a hearing, the Department resolved the issue in a manner which is the very antithesis of sound administrative procedure. It determined the controverted factual question by the simple expedient of believing its staff member, disbelieving plaintiffs, and refusing to give them an opportunity to present evidence on the question. Thus, Sapienza was to be ousted from his position (a result which would inevitably follow from the reclassification), and Jersey City was to be forced to accept in a position which it claimed involved the exercise of vast discretion and responsibility, someone who need only have qualified to hold the job of administrative clerk. And neither party was to be given the opportunity of effectively challenging *50 the decision of the administrative agency which ordered these drastic changes.
The possibilities of abuse or mistake (or both) inherent in such a procedure are manifest. Without a hearing, complete with sworn testimony, cross-examination and the revelation of the sources of the information on which the Department's staff member formed his opinion, who is to say whether the reclassification of the hospital administrator position was or was not a reasonable action? The procedure followed in this case, if sustained, would give the Department carte blanche in such matters, and would effectively immunize it from even the most liberal judicial review.
We do not, of course, suggest that the Department was anything but completely sincere when it took its staff member's characterization of Sapienza's duties as accurate and disregarded plaintiffs' description as something less than true. Nor do we purport to determine here which version of the facts is correct. We say only that when issues of this nature require resolution by an administrative agency as a prerequisite to the exercise of its statutory powers, a hearing is the only means of guarding against possible arbitrary action or mistake.
In Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936), the court was faced with a not dissimilar problem. It was called upon to determine the nature of a proceeding brought by the Secretary of Agriculture fixing maximum rates for buying and selling livestock in the Kansas City stockyards. The issue was whether the hearing required by statute in such cases was one partaking of the elements of a judicial hearing. Chief Justice Hughes noted that the proceeding looked "to legislative action in the fixing of rates" and thus its "distinctive character" was legislative. Nevertheless, the court held that the proceeding had special attributes in that the Secretary was required to determine that the existing rates were "unjust, unreasonable, or discriminatory," before he could prescribe new ones. That duty to make factual determinations carried with it the *51 procedural requirement of a full hearing, and the production of competent evidence. The Chief Justice went on to say,
"* * * A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such finding, has a quality resembling that of a judicial proceeding. Hence it is frequently described as a proceeding of a quasi judicial character." (298 U.S., at page 480, 56 S.Ct. at page 911)
We are not to be considered as saying that the Department must in every case hold a hearing before it reclassifies a position. The right to a hearing must in each case be determined by a consideration of the procedure to be followed by the Department in making its order. If the operative facts are undisputed, the application of the Civil Service law to those facts, resulting in a reclassification, would not be a quasi-judicial action, and a hearing would not be a sine qua non to departmental action. Cf. Falcey v. Civil Service Commission, 16 N.J. 117, 123 (1954); DeStefano v. Civil Service Commission, 130 N.J.L. 267 (E. & A. 1943); Tichenor v. Magee, 4 N.J. Super. 467 (App. Div. 1949). Even in such cases, however, we have indicated that "a hearing is eminently desirable when practicable." New Jersey Manufacturers Cas. Ins. Co. v. Holderman, 54 N.J. Super. 260, 266 (App. Div. 1959). See also Pennsylvania R.R. Co. v. Dep't. of Public Utilities, 14 N.J. 411, 426 (1954).
Nor do we mean to circumscribe unduly the broad discretion granted the Department in actions of this nature. Carls v. Civil Service Commission, above, 17 N.J., at page 221 (1955). Once the Department has made findings of fact following a hearing  in which it may, if it sees fit, rely on facts within its official notice, provided they are spread on the record, Susquehanna Transit Commuters Ass'n. v. Board of Public Utility Comm'rs., 55 N.J. Super. 377 (App. Div. 1959)  its determination of whether the hospital administrator *52 post should be reclassified as administrative clerk is one which will not lightly be disturbed.

V.
Two points remain. Originally Jersey City requested that Sapienza be given temporary certification to the position of hospital administrator pending a competitive examination. After the Department rejected this petition, the city for the first time argued that the position is that of "Head of a Department" and should be in the unclassified service. This contention is clearly an afterthought. The city's own description of Sapienza's duties indicates that he is at most a chief assistant to the medical director. The Department's determination that the medical director is actually the head of the hospital did not involve the resolution of any bona fide factual dispute, and need not have been preceded by a hearing.
Plaintiffs also argue that they should have been granted a hearing on their contention that the Department has misinterpreted N.J.S.A. 11:22-10.1 and 10.2 by holding that Mrs. Spence's reemployment rights extend beyond the Department of Revenue and Finance. The Department has consistently construed the statute in this way for 11 years. This issue is purely one of statutory construction, and it, too, does not require a hearing. In their brief plaintiffs have not argued the merits of the question of statutory interpretation, and we will not now deal with it.
The case is remanded to the Department of Civil Service for a hearing in accordance with this opinion.