FREDERICK von NIEDA ET AL., PROSECUTORS-RESPOND-ENTS, v. HAROLD W. BENNETT, GEORGE E. BRUNNER, FRANK J. HARTMANN, JR., MARY WALSH KOBUS AND FREDERICK von NIEDA, BOARD OF COMMISSIONERS OF THE CITY OF CAMDEN, AND THE CITY OF CAM-DEN, ET AL., DEFENDANTS-APPELLANTS.

Argued May 19, 1936—Decided October 20, 1936.

For the appellants George E. Brunner, Frank J. Hart-mann, Jr., Mary Walsh Kobus, Leo B. Rea, Firmin Michel, Grover C. Richman, Mitchell H. Cohen, Edward V. Martino, John J. Cream, Clay W. Reesman and William D. Sayrs, *Walter S. Anderson, Jr.* (*Carl Kisselman,* of counsel).

For the appellant, City of Camden, *Carl Kisselman.*

For the respondents, *S. Rusling Leap.*

The opinion of the court was delivered by

PERSKIE, J. The determinative question presented in all these cases, which were consolidated into one cause, is whether a *de facto* body can create a *de jure* officer.

The facts which give rise to this question are not in serious dispute and are substantially as follows: Camden, a second class city, operating under commission form of government, held its quadrennial election of five commissioners on May 14th, 1935. The returns of the election received that night and early the next morning indicated the election of von Nieda and Bennett, of one faction, and Brunner and Kobus, of the other faction, as commissioners. As to them there is no dispute. The tabulated votes indicated, and it was so announced, that there was a tie vote between Leonard and Hartmann, each of opposing factions for the fifth commissioner. The city clerk after canvassing the votes reported that Leonard was elected over Hartmann by a majority of three votes, and issued his certificate of election certifying that Bennett, von Nieda, Brunner, Kobus and Leonard had been elected city commissioners. Action was promptly taken by Hartmann for a recount of the votes cast, disputing Leonard's right to the office. While this dispute was pending Leonard was, on May 21st, 1935, over the protests of Brunner and Kobus, sworn in as a city commissioner. On this day the commissioners, with Leonard as a member, proceeded with the organization meeting. A resolution was introduced designating von Nieda as mayor. Before vote was taken thereon Kobus and Brunner registered protest against the making of permanent designations or appointments giving as their reason that such action should await the outcome of the dispute between Leonard and Hartmann. Despite these objections, the commissioners, by a vote of three to two, Leonard voting with the majority, designated von Nieda as mayor and six of the respondents herein to various offices (city counsel, first assistant city counsel, second assistant city counsel, police court judge, city prosecutor, overseer of the poor and deputy city clerk). On May 28th, 1935, by a like vote the said commissioners appointed the respondents Braun and Borz as city clerk and deputy city clerk.

Following the initial meeting of the commissioners the recount of the disputed election between Hartmann and Leonard determined that the former received a majority of seven votes over the latter. Accordingly Leonard's certificate

was revoked and Hartmann received a certificate of his election on or about August 1st, 1935. On August 1st, 1935, Hartmann was sworn in as a commissioner, and a reorganization of the commission ensued. By a majority vote (three to two) of the commissioners Brunner was designated as mayor. Further resolutions were adopted having for their purpose the re-allocation of various functions and bureaus in the city government among the several departments. Protest was made by the minority faction to the action.

On September 16th, 1935, the majority commissioners, Brunner, Kobus and Hartmann, passed resolutions over the protests of von Nieda and Bennett dismissing the respondents herein from the offices to which they were appointed on May 21st, 1935, and appointing the appellants herein in their stead. Respondents sued out writs of *certiorari* to review the action of the commissioners aforesaid. The Supreme Court ordered the resolutions set aside. Hence this appeal.

The opinion of the court below carefully points out the basic pronouncements of our courts, on the subject, in the pertinent cases of *Erwin* v. *Jersey City*, 59 *N. J. L.* 282; 35 *Atl. Rep.* 948; *affirmed*, 60 *N. J. L.* 141; 37 *Atl. Rep.* 732, and *Brinkerhoff* v. *Jersey City*, 64 *N. J. L.* 225; 46 *Atl. Rep.* 170. Although each case "directly involved merely the right to salary," nevertheless, the pronouncements therein, on the issue before us, are not in harmony; they are, in fact, directly opposite. In the former case Chief Justice Beasley, for the Supreme Court, squarely held that a *de facto* board cannot create a *de jure* officer. This court, on appeal from a nonsuit resulting from a second trial of that case, held (expressly passing the question here presented) that plaintiff who became a public officer *de facto,* without dishonesty or fraud on his part, and who actually rendered the services required of him as such public officer was entitled to recover the compensation provided by law for said services. In the latter case this court, after reviewing the decisions and authorities on the *de facto* doctrine, disapproved the doctrine enunciated by Chief Justice Beasley in the Erwin case and held:

"Upon these principles we think that the act of the board of finance in appointing Brinkerhoff conferred upon him the

right to the office of corporation counsel, and he acquired a title *de jure* which the authorities of the city were bound to recognize."

In the instant case the court below noted the obvious distinction between the issue in the Erwin and Brinkerhoff cases (right to salary for services rendered) and the issue in the case at bar (right to office), but concluded, since this court deemed it proper, and did in fact pass on the question of title *de jure* in the Brinkerhoff case, that it was bound by that determination. It is, however, interesting to mark the observation made by the court below on the rule as stated in the Brinkerhoff case. It said:

"Whatever may be said as to the *apparent unfairness of the rule that a de facto board may appoint a de jure officer, we think that the rule has been definitely settled in this case by the Court of Errors and Appeals in the case of Brinkerhoff* v. *Jersey City,* 64 *N. J. L.* 225." (Italics supplied.)

We are, of course, not so bound. It is true that there is some conflict of authority on the subject. But we are free to adopt the view which we think finds greater support in right, reason, fairness and justice. We think that when a rule of law becomes subject, and correctly so, to the observation, especially by an appellate court, that there is something to be said against its "apparent unfairness" the time is ripe for the extirpation of that rule of law from our great body of legal jurisprudence. It is the aim of all those dedicated to the science of formulating and construing rules of law that each rule and construction thereof shall have for its foundation the elementary but indispensible attributes of righteousness, fairness and justice. When a rule of law is based on such a foundation it cannot be subject to the justifiable observation that there is something to be said against its "apparent unfairness."

Here we find a striking illustration of the unfairness and the injustice of the rule as laid down in the Brinkerhoff case. It has nothing in right, reason, fairness or justice to support it. It merely tends to lend color to the false philosophy that might is right. We are in accord with the sound reasoning of Chief Justice Beasley in the Erwin case. It warrants repetition. He said (at *pp.* 284, 285):

"* * * Claiming the salary in dispute, what is the plaintiff's status against the city?

"On the argument it was contended that he is in this proceeding to be regarded as an officer *de jure,* but I have found no semblance of strength in that position. We have seen that the board, from which he derives his title, was illegally constituted, and in his election it acted as a *de facto* and not as a *de jure* body. Can the appointee of such a board prevail in a court of law when he sets up that he has a legal title to the office so illegitimately conferred?

"The question is an important one, and has been considered with corresponding care.

"The doctrine that legal validity attaches to the acts of public officers who, having an official semblance, are, in fact, destitute of all authentic title, is true only within certain limits, for it exists only so far as there is a public necessity for its prevalence, and no further. If, in the ordinary affairs of business, all persons were bound to verify the titles of public officials before they could rely upon their acts, the burthen would be intolerable. It is not too much to say that a considerable part of such business could not be transacted under the pressure of such a rule. It is always to be deprecated that the act of a usurper of office should have a legal sanction conferred upon it, but this result obtains by reason of the great public inconvenience that its rejection would introduce. To this extent and on this ground the law legalizes the act of the intruder. It is obvious, therefore, that public utility is the sole reason that can be assigned in favor of the prevalence of the doctrine, and it is thus manifest that such doctrine is a judicial creation, and consequently it is not to be applied in the regulation of any case that does not plainly fall within the principle in which it has operated. Unlike matters proceeding from legislation, in a case thus conditioned there is no place for the maxim *voluntas stat pro ratione,* and on this account the reason for the rule and the scope of its operation must be coterminous.

"In the light of this view it becomes conspicuous that the general rule, acknowledged on all sides, that gives efficacy to the acts of the officer *de facto,* cannot have the effect of invest-

ing the appointees of *de facto* boards with *de jure* titles. I have failed to see a single reason for perpetuating the wrong done by such an appointment, while the evils of such a principle are serious and multiform, its immediate result being to offer a strong incentive to usurpation, and to prevent the public from having a voice in the selection of its own officials. And, on the other hand, the invalidation of illegitimate titles of this character, when properly put in issue, cannot be a detriment to anyone but to the holders of them. The claim of the indefeasibility of these spurious titles was pointedly rejected in the case of *People* v. *Albany, &c., 55 Barb.* 344, the court saying 'that there can be no such officer *de facto* as against the people in an action at the suit of the people to try the title to the office. The doctrine in respect to officers *de facto* only applies to and in favor of third parties, and to protect innocent parties who have trusted to the apparent title of an officer.' The rationale of this subject seems to me so plain that it is deemed useless to discuss it further."

In the case of *In re George Ringler & Co.,* 204 *N. Y.* 30, 44; 97 *N. E. Rep.* 593 (1912), the Court of Appeals of New York, after reviewing the Brinkerhoff case and other cases and authors on the subject, said:

"We have examined them sufficiently to ascertain that they are all apparently planted upon the accepted doctrine that, as to the public and third persons dealing with public or corporate officers or their appointees, the acts of such officers or appointees are valid. In such cases it matters little whether the officer is such *de facto* or *de jure,* for in either event the law recognizes his acts as binding. But if it is true, as suggested by Judge Dillon, that the office, and not the officer, is the appointing power, it would logically follow that whenever the office lawfully exists all appointments and elections made by any incumbent, no matter how invalid his title, would be *de jure* appointments or elections. It seems to us that this is carrying the *de facto* doctrine beyond the reason upon which it rests. It is certainly more logical to hold that, in cases where public convenience or the rights of innocent third persons require that the acts of those who are permitted to serve as public officers must be held valid, the *de facto* doctrine

will be applied, and that in all other cases where the question arises in a direct proceeding it will be decided according to the fact. It is in terms a paradox to say *that one who owes his election or appointment to an unlawful usurpation of power by another holds his appointment or election de jure. As between themselves, the appointer and the appointee stand upon the same footing. If the former is merely an officer de facto, the latter falls into the same class. That does not give either of them a good title to office. The classification, as we have seen, is merely a legal fiction which the law invokes for the protection of third persons and the public. So far as their own rights are concerned, both appointer and appointee are mere intruders, subject to deposition in the proper proceeding."* (Italics supplied.)

It appears to us that the apposite rule, as pronounced by Chief Justice Beasley in the Erwin case, and as stated in the Ringler case, does have for its foundation the essential attributes of righteousness, fairness and justice.

We adopt the rule as stated by Chief Justice Beasley in the Erwin case. A *de facto* body cannot create a *de jure* officer. To the extent therefore that the holding in the Brinkerhoff case is to the contrary it is accordingly overruled.

The judgment of the court below is reversed; the writs will be dismissed and the action of the *de jure* body of the city of Camden in the several appointments here challenged is sustained, but without costs.

*For affirmance*—LLOYD, WELLS, JJ. 2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, HEHER, PERSKIE, HETFIELD, DEAR, WOLFSKEIL, RAFFERTY, JJ. 8.