## BUCKLER ET AL. *v.* BOWEN
[No. 12, October Term, 1951.]

*Decided November 1, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*F. DeSales Mudd,* with whom were *Mudd & Mudd* on the brief, for the appellants.

*Philander B. Briscoe* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from an order granting a writ of *mandamus*, requiring respondent Ross, Clerk of the Circuit Court, to administer the oath of office to petitioner, Bowen, as an assessor of Calvert County, declaring Bowen to be assessor, legally appointed on November 29, 1950, and requiring respondent Buckler to cease claiming appointment on December 12, 1950.

The rival claimants, Bowen and Buckler, have each "in his time played many parts" in the conduct of public office in Calvert County. Before the 1950 election Bowen was clerk to the County Commissioners, and was a candidate for election as Clerk of the Circuit Court. He was defeated for election by respondent Ross, who had previously been elected in 1946. Buckler had been Sheriff, was Register of Wills, and was a candidate for election as Sheriff. He was defeated for election. Bowen claims to have been appointed assessor by the County Commissioners on November 29, 1950; Buckler claims to have been appointed on December 12, 1950. Buckler served as assessor until ousted by *mandamus* in this case. For the four years before the 1950 election the County Commissioners were A. Claude Turner, from the first election district, President, J. Gill Denton, from the second district, and Benjamin A. Sunderland, from the third district. In 1950 Denton and Sunderland were reelected, but Turner was defeated by Roy C. Howard, Commissioner from the first district. On November 29, 1950, at eleven A.M., the "new" board met and elected Sunderland president. Sunderland and Howard had taken the oath of office that morning. On the same morning, before eleven o'clock, the "old" board, only Turner and Denton being present, purported to appoint Bowen assessor. At the same meeting the board authorized payment to themselves of "$400 each for their services in the Review and Control Assessment program, heretofore provided for that purpose", and apparently authorized or approved

payment of four unnamed bills. On December 12, 1950 the "new" board, only Sunderland and Howard being present, purported to appoint Buckler assessor. On December 18, 1950 Ross refused to administer the oath of office to Bowen; on December 19, 1950 he administered the oath to Buckler. On January 6, 1951 the petition for mandamus was filed. The order from which this appeal was taken was entered on March 17, 1951.

One of the questions at issue is whether Howard took the oath before or after Turner and Denton attempted to appoint Bowen. The record in the Clerk's office shows that Sunderland and Howard took the oath at 9:50; Ross and Sunderland so testify. Sunderland testifies that he asked the clerk to "record the time we were sworn in, because I thought there might be some controversy over the situation, and we looked up at the clock, Mr. Howard and Mr. Ross and myself, and that is what he recorded the time as". Howard did not testify. Ross and Sunderland are the only witnesses who were present when Sunderland and Howard took the oath. Bowen testified, "The Commissioners never got there before ten, and they got there the usual time that morning—* * *— they stayed around there for awhile. Mr. Sunderland said to Mr. Denton, 'Let us go over and take out our commissions.' Mr. Denton said, 'I am not going, I have thirty days to take my commission out', so it was sometime after ten o'clock, according to my judgment, when Mr. Sunderland left the office to go across the hall, or wherever he went, to take out his commission, and the old board adjourned at eleven o'clock, the new board convened right on the heels of the old board going out, because I was acting clerk for both boards. I was Clerk to the old board and Acting Clerk for the new board." Mr. Turner testified that he "got in the office at exactly ten o'clock, * * *. Mr. Bowen and Mr. Denton were in the office. A few minutes after that, Mr. Sunderland came in", said he was going over to "take out his commission" and asked Mr. Denton whether he wanted to take out his. "I would say it was somewhere from

ten to ten fifteen, maybe, when he left, and said he was going to take out his commission. * * * I did not see him any more until after I went over and called up Mr. Rogan and came back in the office, and when I came back in the office Mr. Sunderland and Mr. Howard were in there, along with Mr. Dowell." Mr. Turner had already testified that before he and Mr. Denton appointed Bowen, he had gone to Senator Goldstein's office and had there talked by telephone with Mr. Rogan, Chairman of the State Tax Commssiion. "I called him that morning around ten thirty". Bowen had testified that "somewhere around eleven o'clock, Mr. Turner went out of the office to call Mr. Rogan", before the appointment was made. Mr. Denton testified that he went into the County Commissioners' office about ten o'clock, "and not too long after I was in there, I would say fifteen or twenty minutes, probably", Sunderland came in, asked Denton whether he wanted to go across the hall and take his commission out, Denton said he did not, and Sunderland "turned around and went out and they came in again about a few minutes before eleven o'clock. * * * We had made that appointment [of Bowen as assessor] before they [Sunderland and Howard] came in."

We find no evidence that Bowen was appointed before Howard took the oath; there is affirmative evidence to the contrary. If the testimony of Bowen, Turner and Denton be accepted as contradicting the record in the Clerk's office and the testimony of Ross and Sunderland as to the exact time of the oath, there is still no evidence that the appointment was made before Howard took the oath. The testimony of both Bowen and Turner indicates the contrary. Even if Denton's testimony (in this respect at variance with Turner's) be accepted as meaning that the appointment was made after Sunderland left and before Sunderland and Howard came in, there is nothing to indicate that Howard and Sunderland took the oath at the end, rather than at the beginning, of the interval. Judge Gray did not find it necessary

to pass upon the question whether Bowen was appointed before Howard took the oath.

Section 180 (a) (b) of Article 81 of the Code (1947 Supp.; Acts of 1947, ch. 706; 1948, ch. 64; 1950 ch. 1), which provides for appointment of assessors by County Commissioners, also provides, "* * * No appointment shall be made, however, except in the following manner: (b) The County Commissioners shall submit to the State Tax Commission from the applicants for each position to be filled, a list of not less than three applicants for each position. The State Tax Commission shall interview, examine and grade said applicants, in order to determine their relative qualifications for the position or positions to be filled, and shall certify the list of applicants and their respective grades to the County Commissioners, who shall appoint an assessor for each position from the said list. Upon appointment, each assessor shall perform his duties under the direction of the Supervisor of Assessments, and shall hold his position during good behavior, subject only to removal by the State Tax Commission, after hearing, for incompetency or other cause. * * *"

The County Commissioners, in a letter to Mr. Rogan dated November 21, 1950, submitted to the State Tax Commission the names of Bowen, Buckler and J. C. Ward, "for consideration for appointment as assistant to the Supervisor of Assessments for Calvert County". On November 22nd this letter was presented to the Commission by Bowen and Denton in person, and Bowen was interviewed by the Commission and filled in a blank application for appointment. The same day the Commission sent applications to Buckler and Ward and asked them to come for an interview on November 28th. Buckler had declined to go with Bowen and Denton, and wrote the Commission that he could not go on November 28th, because the Orphans Court would meet on that day, but that he would go on the 29th. He went on the 29th, and in the afternoon, several hours after the appoint-

ment of Bowen, was interviewed. Ward was not interested, and the Commission never heard from him.

On November 28th Mr. Turner "had a telephone conversation with Mr. Rogan, I think around three-thirty or four o'clock, probably. I called Mr. Rogan. * * * And asked him if he was going to send these names down for this appointment, that we would like to make it. He said, 'Yes, the letter is in the mail'. * * * On the morning of the 29th * * * I expected to find the letter, but the letter was not there. I again * * * called Mr. Rogan, and he said that they had put Mr. Lloyd Bowen as first in the recommendations, and we could go ahead and make the appointment and it would be confirmed by letter. * * * He told me Mr. Kenneth Buckler was graded second. * * * I came right in the County Commissioners' office and with Mr. Denton and Mr. Bowen present, we appointed Mr. Lloyd Bowen as assessor." In a letter dated November 30th from the Commission to Mr. Turner as President of the County Commissioners, it was stated that the Commission had interviewed Bowen and Buckler and graded Bowen first, and Buckler second. On December 12th the County Commissioners appointed a clerk to succeed Bowen on the fifteenth; Denton being absent, they appointed Buckler assessor, and notified the State Tax Commission of the appointment by a letter dated December 12th, signed by Sunderland and Howard, with the seal affixed by Bowen. The minutes of this meeting were signed by Bowen as acting clerk. On December 13th Bowen telephoned Mr. Rogan, asked "what had happened to" his appointment, why Mr. Mueller had not been down "to brief him", and was told he had not been sworn in. Mr. Rogan testified that the State Tax Commission, all of its members, already knew enough about both Bowen and Buckler to grade them without interviewing Buckler.

Respondents contend that the appointment of Bowen was invalid both because (1) it was not made in accordance with the requirements of Article 81, section 180 and (2) Turner had ceased to be a County Commissioner

when the appointment was made. Petitioner contends that the quoted provisions of section 180 are directory, not mandatory, and Judge Gray so held. We should hesitate to adopt petitioner's contention to the extent of construing "No appointment shall be made except in the following manner" as meaning "Any appointment may be made in the following manner". We should also hesitate to construe section 180 so strictly as to make it indispensable to grade a list of three applicants when there are only two applicants, or to interview personally, before grading, applicants as well known as both Bowen and Buckler apparently were, or to "certify" in writing, rather than by telephone.

Our view of respondents' second objection makes it unnecessary for us to construe section 180. Article 17, section 1 of the Constitution (the fewer elections amendment, ratified in 1922) provides, "* * * all county officers elected by qualified voters, shall hold office for terms of four years, and until their successors shall qualify." A "term of four years" means four years from the date of election. *Benson v. Mellor*, 152 Md. 481, 488, 137 A. 294. Article 5, section 75, P.L.L. (1930), as reenacted by Chapter 400 of the Acts of 1914, expressly provides for a term of six years "from the date of his election", but was of course superseded by the constitutional amendment. Turner ceased to be a commissioner *de jure* as soon as Howard took the oath. Judge Gray found it unnecessary to determine whether or not Bowen was appointed before Howard took the oath. He concluded "that even if Mr. Howard qualified well in advance of the meeting of the old Board by which the petitioner Bowen was appointed, Mr. Turner was a *de facto* officer and that his action was entirely valid. He was meeting in pursuance of a regularly recessed meeting of the day before and he and his associate Denton acted on various matters, including the appointment of Bowen. His action as a member and president of the Board was not questioned by Mr. Howard, or anybody else, until Howard and Sunderland came in to the County Commissioners'

office at eleven o'clock and announced that they had qualified and desired to take over the work of the Commissioners. Thereupon the meeting of the old Board adjourned and the new Board proceeded to meet and organize. The action taken by the old Board was valid and is not subject to collateral attack in this proceeding. The validity of the acts of an official who proceeds under color of title of his office in good faith and without question by any person concerned is good insofar as the public and all third persons are concerned." There can be no question that "insofar as the public and all third persons are concerned", both Bowen (pending this appeal) and Buckler (before the writ of *mandamus*) were *de facto* officers and their acts as assessors are valid. In a number of states it has also been held that by appointment by a *de facto* board or officer an appointee may become a *de jure* officer. *St. Luke's Church v. Mathews,* 1815, 4 Desaus. 578, 4 S. C. Eq. 578, 586-590, 6 Am. Dec. 619; *Ohio ex rel. Whitbeck v. Alling,* 1843, 12 Ohio 16; *Brady v. Howe,* 1874, 50 Miss. 607, 623; *Roberts v. Holmes,* 1874, 54 N. H. 560; *People ex rel. Norfleet v. Staton,* 1875, 73 N. C. 546, two out of five judges dissenting; *Iowa ex rel. Hartnett v. Powell,* 1897, 101 Iowa 382, 70 N. W. 592; *Brinkerhoff v. Jersey City,* Err. & App. 1899, 64 N. J. L. 225, 46 A. 170, overruled in *Von Nieda v. Bennett,* 1936, 117 N. J. L. 231, 187 A. 629, 106 A. L. R. 1320, *infra; Commonwealth ex rel. Palermo v. Pittsburgh,* 1940, 339 Pa. 173, 13 A. 2d 24; *State ex rel. Carlson v. Strunk,* 1945, 219 Minn. 529, 18 N. W. 2d 457, citing *Brinkerhoff v. Jersey City* and *People ex rel. Norfleet v. Staton, supra; Dillon* on *Municipal Corporations* (5th Ed., 1911, not in earlier editions) § 519.

However, the best considered cases, we think, especially among recent cases, hold to the contrary, viz., that a *de facto* body or officer cannot by appointment create a *de jure* officer. It was so held by the New Jersey Court of Errors and Appeals in *Von Nieda v. Bennett,* 1936, 117 N. J. L. 231, 187 A. 629, in a persuasive opinion

which reviews authorities in New Jersey and elsewhere, expressly overrules that court's own decision in *Brinkerhoff v. Jersey City, supra,* and approves the prior Supreme Court case of *Jersey City v. Erwin,* 59 N. J. L. 282, 35 A. 948. It had been so held in two New York Supreme Court cases regarding public offices. *Mayor etc. of New York v. Flagg,* 1858, 6 Abb. Pr., N. Y., 296; *New York, ex rel. Steinert v. Anthony,* 1875, 6 Hun., N. Y., 142. In *In Re George Ringler and Company,* 1912, 204 N. Y. 30, 97 N. E. 593, a private corporation case, the court followed *Mayor v. Flagg* and *New York ex rel. Steinert v. Anthony, supra,* and after quoting Judge Dillon to the contrary said, "It is certainly more logical to hold that in cases where public convenience or the rights of innocent third persons require that the acts of those who are permitted to serve as public officers must be held valid, the *de facto* doctrine will be applied, and that in all other cases where the question arises in a direct proceeding it will be decided according to the fact. It is in terms a paradox to say that one who owes his election or appointment to an unlawful usurpation of power by another, holds his appointment or election *de jure.* As between themselves, the appointer and the appointee stand upon the same footing. If the former is merely an officer *de facto,* the latter falls into the same class. That does not give either of them a good title to office." 204 N. Y. 44. Regarding a *de facto* officer the court also said, "Without right himself he cannot confer any on others. His appointment of deputies or subordinates, as to himself and them, would be as void as any other colorable official act. It might make them severally officers *de facto* as to third persons, but could give them no better or greater right to institute, as such, any affirmative action or proceeding than he himself had or has, as an officer *de facto.*" 204 N. Y. 46, 97 N. E. at page 598. The *Ringler* case is quoted in *Von Nieda v. Bennett, supra. Von Nieda v. Bennett* has been followed in *State ex rel. Scanes v. Babb,* 1942, 124 W. Va. 428, 20 S. E. 2d 683, and *State, ex rel. Roush*

*v. Board of Education*, 1945, 128 W. Va. 150, 35 S. E. 2d 850. . In the latter case the court said, "We believe that the better rule is that those claiming title to office conferred by a *de facto* officer, or by an organization of which he acted as an essential part, should not be regarded as third persons when their right to hold the office is directly questioned. We believe that their status should be held to be interrelated with that of the unit conferring the office so that they are charged with knowledge of the defect in their title thereto. We know that this principle, theoretically, may occasionally result in injustice and in the temporary disruption of organizations, but as compared with the otherwise temptation to wrongfully get and illegitimately retain office, we prefer it." 128 W. Va. 153, 35 S. E. 2d 851.

Without adopting *in toto* either of these two conflicting lines of authorities, we are satisfied that, with respect to the appointment of Bowen, Turner was not a *de facto* officer and (if he was) Bowen was not a "third person". Turner does not answer Lord Holt's brief description of a steward *de facto* as "no other than he who has the reputation of being such steward, and yet is not a good steward in point of law". *Parker v. Kett*, 1 Lord Raymond 658, 660 (1693). It cannot properly be said that Turner had the reputation of being County Commissioner between ten and eleven o'clock on November 29th, or that Bowen did anything, or had a right to do anything, in reliance on Turner's appearance of being Commissioner. Apparently no one was present at both the taking of the oath by Howard and the attempted appointment of Bowen. But Bowen knew as well as anyone that Turner ceased to be Commissioner *de jure* when Howard took the oath; he had as much opportunity as anyone to ascertain whether Howard had taken the oath before Bowen was appointed. Bowen did not until December 13th inquire "what had happened to his appointment", and did not try to take the oath until December 18th. Meanwhile the new board on December 12th had appointed Buckler. Other than attempting to appoint

Bowen, Turner did nothing as Commissioner on November 29th except to pass a few non-controversial routine bills, including compensation of the Commissioners.

The doctrine of *de facto* officers has been universally recognized, frequently by this court. *Smith v. Erb,* 4 Gill 437, 460-462; *Koontz v. Burgess etc. of Hancock,* 64 Md. 134, 136, 20 A. 1039; *Izer v. State,* 77 Md. 110, 115-116, 26 A. 282; *Havre de Grace v. Fahey,* 108 Md. 533, 538-539, 70 A. 218; *Kimble v. Bender,* 173 Md. 608, 622-627, 196 A. 409. As has been indicated, there is not agreement as to the boundaries of the doctrine. It is, however, agreed that the doctrine does not legalize the acts of mere usurpers. Statements in early English cases, repeated in American cases, created a widespread belief that a *de facto* officer is only one "claiming to be such officer under color of an election or appointment", however invalid the election or appointment. *Carleton v. People,* 10 Mich. 250, quoted in *Izer v. State,* 77 Md. 110, 115, 26 A. 282. In *State v. Carroll,* 38 Conn. 449, 467-472, cited with approval in *Izer v. State, supra,* and in other states, the court, exhaustively reviewing the English and American cases, showed that this was a mistaken view of the English cases and too narrow a definition of a *de facto* officer, and proceeded to formulate a more comprehensive definition, which is quoted in full in *Norton v. Shelby County,* 118 U. S. 425, 446, 6 S. Ct. 1121, 30 L. Ed. 178, "An officer *de facto* is one whose acts, though not those of a lawful officer, the law upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised: First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be. * * * Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect

or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public. * * *" 38 Conn. 471. In *Izer v. State, supra*, [77 Md. 110, 26 A. 283], a conviction of perjury was affirmed against objection that the deputy clerk (Williamson) who administered the perjured oath had not duly qualified as deputy clerk. The court said, "But Williamson was then in the undisputed possession of the office of deputy clerk, and since 1886 had openly and notoriously discharged the duties pertaining thereto. He was at least a *de facto* officer, filling a *de jure* office, and whatever defects or irregularities there may have been in the manner of his appointment or qualification, his acts, done under color of title, are, upon grounds of public policy and necessity, valid and binding. *Norton v. Shelby Co.*, 118 U. S. 425." In *Norton v. Shelby County, supra*, it was held that there cannot be a *de facto* officer unless there exists a *de jure* office. In *Kimble v. Bender*, 173 Md. 608, 625-627, 196 A. 409, *Norton v. Shelby County* was cited and followed in this respect, though there is a headnote in conflict with that decision. In *Waite v. Santa Cruz*, 184 U. S. 302, 323, 22 S. Ct. 327, 334, 46 L. Ed. 552, it was said (and is quoted by Judge Gray), "A *de facto* officer may be defined as one whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper. When a person is found thus openly in the occupation of a public office, and discharging its duties, third persons having occasion to deal with him in his capacity as such officer are not required to investigate his title, but may safely act upon the assumption that he is a rightful officer." In the *Waite* case a mayor and council, whose successors had been elected and had qualified on April 16, 1894, continued in public exercise of office until May 7, 1894. After their successors had qualified the former mayor signed and delivered municipal bonds. The "third persons"

were *bona fide* holders for value. Why the successors so long delayed acting after they had qualified is unexplained. Conceivably foresight or timidity (which-the event would have jusified) may have led them to prefer to have no part in a bond issue which had been initiated by their predecessors and approved by the voters. Whatever the reason, the language quoted is not properly applicable to Turner or Bowen during the hour from ten to eleven o'clock.

We have found no case in which the status of *de facto* officer and "third person" has been established on the basis of facts as slender as those relating to Turner and Bowen. In *St. Luke's Church v. Mathews, supra,* a rector appointed by a *de facto* vestry was held to be validly appointed, and to be entitled to his salary, for the first year, but not for the second year because he then knew of the illegality of the election of the vestry. In *People ex rel. Norfleet v. Staton, supra,* in which an appointee of a *de facto* officer was held to be a *de jure* officer, the court said, "A *de facto* officer is one who goes under *color* of authority—* * *—or who exercises the duties of the office so long or under such circumstances as to raise a presumption of right; in which cases his necessary official acts are valid as to the public and third persons, but he may be ousted by a direct proceeding." 73 N. C. 550. In *Brady v. Howe, supra,* in which an appointment of a clerk by a *de facto* judge was held valid, the court said, "to constitute an officer *de facto*, there must be color of right by election or appointment, or an acquiescence by the public, for a length of time which would afford strong presumption of colorable right." 50 Miss. 623. In *Commonwealth ex rel. Palermo v. Pittsburgh, supra,* an appointee of a *de facto* Director of Public Safety was dismissed by a subsequent *de jure* Director, and was reinstated by mandamus. The court held that the defense was a collateral attack on the title of the *de facto* Director (who had openly exercised the duties of Director for several weeks), which could properly be attacked only by a direct proceeding in *quo war-*

*ranto*. In the instant case manifestly no direct proceeding could be brought against Turner and Denton before eleven o'clock. The instant case presents, directly we think, in the only possible way, the question of the right of Turner and Denton to appoint Bowen.

Petitioner contends that respondents cannot question Turner's right to appoint Bowen because they did not do so in their answers. Article 60, sec. 3 of the Code (1939), (Acts of 1858, ch. 285) provides, "The defendant, by the day named in such order, shall file an answer to such petition, fully setting forth all the defenses upon which he intends to rely in resisting such application, which shall be verified by his affidavit." In *Pennington v. Gilbert,* 148 Md. 649, 129 A. 905, 908, a writ of *mandamus* was granted requiring the mayor and other officials of Havre de Grace to make payments into a sinking fund as ordered by the city council. The only defense made was that respondents could not get the money. On this point the court held the answer vague and indefinite and said, "To hold that such an answer is sufficient to defeat an application for a mandamus based upon an admittedly valid order of the duly constituted authorities of a municipal corporation would place a premium upon uncertainty and vagueness. We accordingly think that the action of the trial court in sustaining the demurrer to the amended answer was correct." In the instant case *Pennington v. Gilbert* is not in point, and petitioner's contention cannot be sustained. Petitioner's case rests on his right to office, which in turn rests on Turner's right to participate in the appointment. He is not relieved of the burden of proving his case by failure of respondents to question Turner's status in their answers. Furthermore, petitioner alleges his appointment in paragraph 4 of the petition; Ross in his answer says he "can neither admit nor deny the allegations of paragraphs 3 and 4 of the petition", and Buckler in fact does not admit or deny the appointment. Petitioner did not except to the sufficiency of the answers.

Article 7, sec. 1 of the Constitution provides, "County Commissioners shall be elected on general ticket of each county by the qualified voters of the several counties of the State, * * *; their number in each county, their compensation, powers and duties shall be such as now or may be hereafter provided by law; * * *." Under Article 5, sec. 75, P.L.L. (1930), as reenacted by Chapter 400 of the Acts of 1914, three commissioners are elected, by all the voters of the county, one from each of three election districts. At the 1950 election, for county commissioner from the first district Mr. Howard had 2,162 voters, Mr. Turner 2,060; for commissioner from the third district Mr. Sunderland had 2,056 votes, his opponent 2,047. Before the fewer elections amendment of 1922, one commissioner was elected every two years for a term of six years. It has been suggested that section 75 may be unconstitutional in requiring election of one commissioner from each district instead of three from the county at large. See *Judge Alfred S. Niles* on *Maryland Constitutional Law*, pages 303- 304. If this suggestion is sound it would invalidate not only the election of Mr. Howard in 1950, but all elections of county commissioners in Calvert County since 1922. *Benson v. Mellor, supra.* It is not suggested that Mr. Turner and Mr. Denton were county commissioners in 1922. Invalidation of all elections since 1922, therefore, would not help petitioner's case. It is, therefore, unnecessary to pass upon the suggested constitutional question.

*Order reversed with costs and petition for mandamus dismissed.*